# EXHIBIT A

**BEFORE THE**
**MONROE CIRCUIT COURT**
**MONROE COUNTY, INDIANA**

FILED
NOV 16 2006
Jim Fielder
CLERK MONROE CIRCUIT COURT

**KEVIN C. RYAN,** )
)
**Plaintiff,** )
)
**v.** ) **Cause no.** 53C01 0611 PL 02300
)
**UNDERWRITERS LABORATORIES, INC.** )
)
**Defendant.** )

**COMPLAINT**

Now comes Plaintiff Kevin C. Ryan, by the undersigned counsel, and for his complaint for wrongful discharge against Defendant corporation Underwriters Laboratories, Inc. states and alleges as follows:

## I. JURISDICTION

1. The Circuit Court has jurisdiction over this civil tort action pursuant to I.C. 33-28-1-2.

## II. PARTIES

### A. PLAINTIFF

2. Plaintiff Kevin C. Ryan is currently a resident of Monroe County, Indiana.

3. Mr. Ryan is a chemist who was hired by Environmental Health Laboratories, Inc. (EHL) in South Bend Indiana which lab was subsequently acquired by Defendant Underwriters Laboratories, Inc. (UL). Mr. Ryan was an employee of UL at the time his employment was involuntarily terminated on November 16, 2004.

4. Mr. Ryan had good performance and favorable performance evaluations while employed with EHL and EHL/UL.

5. Mr. Ryan received promotions while an employee at EHL/UL, including a promotion to Laboratory Manager, the highest position at the South Bend facility.

6. On November 16, 2004, UL terminated Mr. Ryan's employment. The letter of termination provided to Mr. Ryan from UL stated that UL was terminating his employment because of a letter Mr. Ryan had written to a federal government agency, the National Institute of Standards and Technology (NIST), concerning the collapse of the World Trade Center Twin Towers and Building 7 following the September 11, 2001 attacks.

**B. DEFENDANT**

7. Defendant Underwriters Laboratories, Inc. is a not-for-profit corporation with headquarters in Northbrook, Illinois.

8. UL has offices and conducts business world wide.

9. UL has been engaged in business for more than a century.

10. UL is in the business of performing product safety testing and certification related to consumer products and construction materials.

11. UL does substantial work under contract with the United States government, including contracted work for the NIST relating to the WTC building collapses.

12. UL acquired Environmental Health Laboratories, Inc. in South Bend, Indiana and now operates this laboratory as the UL Drinking Water Laboratory.

13. UL has a division office in Northbrook, Illinois, in addition to its headquarters.

14. UL was the employer of Plaintiff Kevin Ryan from the time UL acquired EHL until UL terminated Mr. Ryan's employment on November 16, 2004.

**III. COUNT 1: WRONGFUL DISCHARGE**

15. The preceding paragraphs and fact allegations are incorporated herein by reference.

16. Following the tragic events of September 11, 2001, and after a period of study and reflection, on November 19, 2003 and in follow-up on December 2, 2003, Mr. Ryan communicated directly with the CEO and other officials of UL and stated the following concerns:

a) UL had a role historically in testing and certifying the steel components used to construct the WTC, and based on the information available to Mr. Ryan, UL had certified the steel properly as capable of withstanding temperatures from hotter and longer lasting fires than those experienced on September 11, 2001, which raised the serious, and yet to be convincingly answered question as to why three WTC buildings collapsed on September 11, 2001;

b) The official government explanation of the WTC building collapses was flawed, i.e. the government's explanation that the impact of the aircraft and the fires from the jet fuel caused the unprecedented collapse of the steel framed WTC Twin Towers and WTC Building 7 was not supported by a scientific analysis of the evidence;

c) Substantial evidence supported the conclusion that the three WTC buildings that collapsed did so due to a well-engineered controlled implosion resulting from the use of explosives devices placed in the buildings, evidence including the videotaped uniform controlled nature of the collapses of these three WTC buildings into their own footprints at near free fall speeds, and eyewitness accounts, including accounts of firefighters, of bomb-like explosions in the WTC buildings occurring during the time people in the buildings were trying to escape following the aircraft strikes;

d) A scientific analysis of the remains of the collapsed WTC buildings steel would almost certainly provide a definitive answer to the question of which of these two

competing explanations for the WTC buildings collapses – the official story that the jet fuel fires softened the steel or otherwise caused the steel to fail versus the alternative explanation that a controlled implosion resulting from use of explosive devices occurred – was the truth; and

e) The steel beams from the collapsed WTC buildings had been immediately removed from the WTC site and shipped for recycling before investigators could examine them, constituting in the opinion of experienced fire investigators and Mr. Ryan the improper destruction and removal of evidence; and

f) UL needed to act on this information at a minimum to protect its reputation in regard to the worst safety-related disaster in the history of the United States, but also to prevent future deaths.

17. The CEO of UL wrote back to Mr. Ryan, as did one or more other UL officials. The CEO's response included several key assertions of fact regarding the collapse of the three WTC buildings on September 11, 2001 WTC attacks which were erroneous, including:

a) The assertion that extremely high temperatures were reached almost immediately after the aircraft strikes;

b) These extremely high temperatures were sustained for a very long time;

c) The steel in the three WTC buildings that collapsed "stood longer than expected;"

d) A "cascading effect" (a.k.a. a pancake collapse) was involved in the collapse of these WTC buildings;

e) The WTC towers were designed to withstand the impact of a 707 jet hitting the building but at the same time was not designed to withstand the fire caused by the jet fuel carried by a 707 jet; and

f) A 707 jet impacting the buildings was reasonably foreseeable but the fire

resulting from the jet fuel carried by the same 707 jet was not reasonably foreseeable.

18. Between December 2, 2003 and November 11, 2004, UL took no actions to address the substantial concerns Mr. Ryan had raised.

19. On November 11, 2004, Mr. Ryan wrote a letter to the National Institute of Standards and Technology ("NIST") raising several specific concerns including:

a) The government's investigation of the September 11, 2001 collapse of the WTC Twin Towers and WTC Building 7 following the crash of two aircraft into the WTC twin towers was inadequate;

b) Significant flaws exist in the official explanation, including NIST's explanation, for the WTC building collapses;

c) UL had tested and certified the steel components used to construct the WTC tower;

d) One or more safety related failures may have caused the majority of fatalities in this tragic event, including the possibility that the WTC steel unexpectedly failed at temperatures of approximately 250C, a fact that should be of great concern to the company that certified the fire-proofed steel components, UL;

e) A scientific analysis of the evidence does not support the conclusion that the building fires or fires from the jet fuel can explain the collapse of the three WTC buildings, a fact which should be of great concern to all Americans (because of the implications for what really did cause these WTC buildings to collapse);

f) The NIST's summary of its investigation report regarding the WTC steel and temperatures to which it was exposed is inconsistent with the NIST's own findings in the body of the investigation report; and

g) The work of the NIST in investigating the collapse of the WTC buildings is critical to the safety and security of the nation and the world because it is the crux of the crux of the crux – i.e. because the NIST investigation could disclose facts material to

understanding what really happened in the WTC building collapses, which in turn could shed critical light on the true nature of the events of September 11, 2001, which events in turn are the driving force behind the "War on Terror;" and a failure of the NIST to identify the truth of what really happened will have serious consequences for the nation, and for global peace and justice; and

h) A number of current and former government employees have risked a great deal to help the nation know the truth of what happened on September 11, 2001, and Mr. Ryan has copied one such person on his letter to NIST in support of that effort.

20. In closing his letter to NIST, Mr. Ryan implored NIST to act quickly to do all it can to eliminate the confusion regarding the cause of the collapse of the WTC buildings on September 11, 2001.

21. On the same day he wrote the letter, Mr. Ryan made his November 11, 2004 letter to NIST available to a citizen's organization that was investigating the events of September 11, 2001, including the possibility that the collapse of three WTC buildings may have been due to the intentional use of explosives placed within those buildings by criminal elements within the United States government.

22. On the same day, November 11, 2004, the citizen's organization posted Mr. Ryan's letter on the internet.

23. Mr. Ryan made UL officials aware of the November 11, 2004 letter he wrote to NIST, and that it was posted on the internet.

24. Upon learning of the letter and its posting on the internet, UL officials inquired with Mr. Ryan as to whether, if they requested or Mr. Ryan requested, the citizens organization would remove Mr. Ryan's letter of November 11, 2004 from the internet site on which it was posted. UL never requested Mr. Ryan to make any public clarifications regarding his November 11, 2004 letter to NIST to make more clear that he was speaking for himself and not for UL.

25. Mr. Ryan was discharged by UL from his position as Laboratory Manager at EHL/UL on November 16, 2004, five days after Mr. Ryan wrote his letter to the NIST raising the specific concerns stated above regarding the government's investigation of the September 11, 2001 collapse of three buildings at the World Trade Center (WTC) following the crash of two aircraft into the WTC twin towers, and potential causes of those building collapses.

26. In the termination letter UL provided to Mr. Ryan, UL states clearly that Mr. Ryan's November 11, 2004 letter to NIST was the reason UL fired Mr. Ryan.

27. In the termination letter UL provided to Mr. Ryan, UL makes clear reference to the fact that Mr. Ryan's November 11, 2004 letter to NIST was circulated by Mr. Ryan and was posted on the internet.

28. In the termination letter UL provided to Mr. Ryan, UL states clearly that UL believes that it was inappropriate for Mr. Ryan to have commented on UL's tests conducted for its client NIST.

29. In the termination letter UL provided to Mr. Ryan, UL states clearly that Mr. Ryan's November 11, 2004 letter to NIST caused harm to UL's relationship with NIST.

30. UL's assertion in the termination letter UL provided to Mr. Ryan, that UL terminated Mr. Ryan's employment because Mr. Ryan in his November 11, 2004 letter to NIST misrepresented that Mr. Ryan was stating UL's opinions rather than his own was a pretext for the illegal firing of Mr. Ryan in retaliation for Mr. Ryan exercising his rights and acting to fulfill his duties under the United States Constitution, the Constitution of the State of Indiana, and under federal and state laws. Mr. Ryan was stating his own opinion, not UL's, in his letter to NIST. His letter was sent via UL's email system, which UL allowed employees to use for personal email. The email program automatically added the UL title of Mr. Ryan to his email.

31. After UL had terminated Mr. Ryan's employment, one or more of UL's

spokespersons made statements to the press vehemently denying that UL had ever certified materials used in the WTC.

32. After UL had terminated Mr. Ryan's employment, one or more of UL's spokespersons made statements quoted in the press to the effect that "there is no evidence" that any firm, including UL, tested the materials used to build the WTC towers.

33. After UL had terminated Mr. Ryan's employment, one or more of UL's spokespersons made statements quoted in the press that UL does not certify structural steel, such as the beams, columns and trusses used in the WTC.

34. After UL had terminated Mr. Ryan's employment, one or more of UL's spokespersons made statements quoted in the press asserting that the reason UL had fired Mr. Ryan was because Mr. Ryan expressed his opinions regarding the WTC building collapses as if they were the opinions and beliefs of UL.

35. After UL had terminated Mr. Ryan's employment, one or more of UL's spokespersons made statements to the press stating that Mr. Ryan's argument regarding the WTC building collapses was "spurious" and "just wrong."

36. UL wrongfully terminated Mr. Ryan's employment because Mr. Ryan in his November 11, 2004 letter to NIST, exercised his right under the United States Constitution and under the Constitution of the State of Indiana to petition his government for redress of grievances and to reform his government.

37. UL wrongfully terminated Mr. Ryan's employment because Mr. Ryan in his November 11, 2004 letter to NIST, in his communications with citizens organizations, and in his communications with UL officials, exercised his right to freedom of speech under the First Amendment of the United States Constitution and under the Constitution of the State of Indiana to speak publicly on matters of public importance.

38. UL wrongfully terminated Mr. Ryan's employment because Mr. Ryan in his November 11, 2004 letter to NIST, exercised his right under the laws of the United

States, the State of Indiana, and the State of New York, including the Occupational Safety and Health Act (OSHA), to report safety hazards and to disclose material facts in a government investigation of a occupational and public safety related incident.

39. UL wrongfully terminated Mr. Ryan's employment because Mr. Ryan in his November 11, 2004 letter to NIST, exercised his right under the laws of the United States, the State of Indiana, and the State of New York to report potential felonies and terrorist activity.

40. UL wrongfully terminated Mr. Ryan's employment because Mr. Ryan in his November 11, 2004 letter to NIST, acted to fulfill his duty under the United States Constitution and under the Constitution of the State of Indiana to petition his government for redress of grievances and to reform his government in the face of actions by persons seeking to subvert the legally constituted government of the United States and seeking to subvert and fundamentally alter the democratic nature of our society and the republican form of our government.

41. UL wrongfully terminated Mr. Ryan's employment because Mr. Ryan in his November 11, 2004 letter to NIST, in his communications with citizens organizations, and in his communications with UL officials, acted to fulfill his duty as a United States citizen and citizen of the State of Indiana to defend the United States Constitution and the Constitution of the State of Indiana.

42. UL wrongfully terminated Mr. Ryan's employment because Mr. Ryan in his November 11, 2004 letter to NIST, acted to fulfill his duty under the laws of the United States, the State of Indiana, and the State of New York, including the Occupational Safety and Health Act (OSHA), to report safety hazards and to disclose material facts in a government investigation of an occupational and public safety related incident.,

43. UL wrongfully terminated Mr. Ryan's employment because Mr. Ryan in his November 11, 2004 letter to NIST, acted to fulfill his duty under the laws of the United

States, the State of Indiana, and the State of New York to report potential felonies and terrorist activity.

**IV. PRAYER FOR RELIEF**

44. WHEREFORE, Plaintiff requests that this court award the following relief and damages to compensate Plaintiff for Defendant's wrongful discharge of Plaintiff:

a. Award to Plaintiff back pay from the date Defendant terminated his employment;

b. Award Plaintiff $200,000 in front pay in lieu of reinstatement, or reinstatement;

c. Award Plaintiff consequential damages for the cost of his relocation and job search, and the lost value of the medical insurance, retirement plan and other benefits Plaintiff would have enjoyed had Defendant not terminated his employment;

d. Award Plaintiff damages for emotional distress and damage to reputation in an amount to be determined by the trier of fact;

e. Award Plaintiff punitive damages in an amount to be determined by the trier of fact in accordance with applicable law;

f. Award the Plaintiff such other and further relief to which the law entitles him and such other relief as this Court may deem proper.

Respectfully submitted,

Mick G. Harrison, Esq., Counsel for Plaintiff
The Caldwell Center
323 S. Walnut
Bloomington, IN 47401
812-323-7274 (voice)
859-321-1586 (cell)
859-986-2695 (fax)
mickharrisonesq@earthlink.net

Counsel for Plaintiff

Rudolph Wm. Savich, Esq., 1582-53, Counsel for Plaintiff
205 N. College Ave.,
Graham Plaza- Ste. 315
Bloomington, IN 47404-3952
Tel. (812) 336-7293
Fax. (812) 336-7268
rsavich@aol.com

Kara L. Reagan, Esq., Counsel for Plaintiff
Stafford Law Office, LLC
714 West Kirkwood Ave.
P.O. Box 2358
Bloomington, IN 47402
812-339-6055
812-339-6877 (fax)
KARA@CSTAFFORDLAW.COM

Dated: November 16, 2006