UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

KEVIN RYAN,                              )
                                         )
              Plaintiff,                 )
                                         )
       vs.                               )          1:06-cv-1770-JDT-TAB
                                         )
                                         )
UNDERWRITERS LABORATORIES, INC.,  )
                                         )
              Defendant.                 )


**ENTRY ON DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT (Doc. No. 24)[1]**


       About two and a half years ago, Underwriters Laboratories, Inc. ("UL") fired Kevin

Ryan, a laboratory manager at its South Bend drinking water laboratory, after he sent

an e-mail letter to the National Institute of Standards and Technology ("NIST"), the

federal agency that conducted a three-year building and fire safety investigation of the

collapse of the World Trade Center buildings on September 11, 2001.[2]


       In his November 11, 2004, letter, Mr. Ryan questioned the government's

explanation for the collapses of the World Trade Center buildings following the terrorist

attacks.  (Am. Compl. ¶ 21.)  He also suggested that UL had tested and certified steel

_____

       [1]  This Entry is a matter of public record and will be made available on the court's web
site.  However, the discussion contained herein is not sufficiently novel to justify commercial
publication.

       [2]  *See* National Institute of Standards and Technology, *NIST and the World Trade
Center*, http://wtc.nist.gov/ (last visited Aug. 7, 2007).  NIST is a non-regulatory agency of the
Technology Administration of the U.S. Commerce Department.

used in the buildings (a charge UL reportedly denied).[3]  (*Id.* ¶ 21(c).)  He dispatched a copy of the letter, bearing his name and title with UL, to a citizens group, which immediately posted the letter on the Internet.  (*Id.* ¶¶ 23-24.)  Five days later, on November 16, 2004, UL fired Mr. Ryan.  (*Id.* ¶ 27.)

This litigation began November 16, 2006, when Mr. Ryan filed a lawsuit alleging that UL had wrongfully discharged him.  He claimed that even though he was an employee at will, and therefore subject to discharge at any time for any reason or no reason at all, his firing fell under a public policy exception to at-will employment.  He alleged that his discharge was actionable because UL fired him in retaliation for fulfilling or exercising various rights or duties under federal and state constitutions and laws.[4]

UL describes Mr. Ryan's claims of alleged flaws in the official explanation for the World Trade Center collapses as the product of "outrageous conspiracy theories." (*See, e.g.*, Def.'s (First) Mem. Supp. 2.)  However, the substance of his allegations is not presently an issue.  Pending before the court is a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  At this stage, the key issue is simply whether Indiana law recognizes the sort of wrongful discharge claims that Mr. Ryan alleges.

---

[3] (*See* Am. Compl. ¶ 34.)  Like much in this case, which is still in the initial pleading stage, the facts are sometimes murky.  The record before the court does not include a copy of Mr. Ryan's letter to NIST, and his Amended Complaint is unclear whether Mr. Ryan is alleging that UL tested the steel prior to construction or following the collapses, and whether the steel testing was in addition to or included the contracted work that Mr. Ryan alleges that UL performed for NIST related to the collapses.

[4] Mr. Ryan acknowledges that UL gave other grounds for his firing, including that he had commented inappropriately on UL tests conducted for NIST and misrepresented his opinions as UL's, but he disputes these were the real reasons.  (*See* Am. Compl. ¶¶ 30, 32.)

In his initial brief, Mr. Ryan asserted, for the first time, that his wrongful discharge action also encompassed a claim under an Indiana whistle blower protection statute. (Pl.'s  Resp. Opp'n Mot. Dismiss Compl. [hereinafter Pl.'s First Resp.] 1.)  When UL replied that this claim was defective because Mr. Ryan did not allege any misconduct by UL in its "execution of a public contract" (s*ee* Def.'s Reply Supp. Mot. Dismiss  Compl. 13), Mr. Ryan attempted to cure this problem by filing a First Amended Complaint ("Amended Complaint").  In it, he asserts that NIST contracted with UL to perform fire resistance tests on models of, and/or flooring components from, the World Trade Center buildings.  (Am. Compl. ¶ 54.)  He alleges he was also fired because he had made written whistle-blowing reports about violations of law and misuses of resources in public contracts "concerning" UL.  (*Id.* ¶ 53.)

UL filed the pending Motion to Dismiss the Amended Complaint (Doc. No. 24) and brief on June 1, 2007, and Mr. Ryan responded June 21.  UL replied on July 5, 2007.

Mr. Ryan is seeking damages and front pay in excess of $75,000, exclusive of costs and interest, and diversity of citizenship has been established.  He is a citizen of Indiana while UL is a not-for-profit corporation incorporated under the laws of Delaware and its principal place of business is in Illinois.  This matter is therefore properly before the court pursuant to 28 U.S.C. §1332(a)(1).

The court rules as follows.

# I.  STANDARD OF REVIEW

In a Rule 12(b)(6) motion the sufficiency of the litigant's case is generally judged from the complaint.  *Hernandez v. City of Goshen*, 324 F.3d 535, 538 (7th Cir. 2003); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002).[5]  The court must accept as true plaintiff's factual allegations and draw all reasonable inferences in plaintiff's favor.  *Cole v. U.S. Capital*, 389 F.3d 719, 724 (7th Cir. 2004); *Hentosh v. Herman M. Finch Univ. of Health Scis./Chi. Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999).

As the Seventh Circuit has repeatedly reminded, Rule 12(b)(6) must be applied in the context of the liberal federal rules for notice pleading.  *See Hefferman v. Bass*, 467 F.3d 596, 598-99 (7th Cir. 2006); *McDonald v. Household Int'l, Inc.*, 425 F.3d 424, 427 (7th Cir. 2005); *Cler v. Ill. Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005).  Rule 8(a) requires only a short and plain statement of the grounds for jurisdiction, a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment providing the relief sought.  Fed. R. Civ. P. 8(a).  This is bare bones pleading that merely seeks to provide the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005); *Cler*, 423 F.3d at 729.

---

[5]  Aside from documents incorporated by a complaint, a court must confine its review to the pleading or convert the motion to a motion for summary judgment under Rule 56.  *Tierney v. Vahle*, 304 F.3d 734, 738-39 (7th Cir. 2002).

Until recently, courts often distilled these rules into the statement that dismissal is appropriate only when it is clear that the plaintiff can prove no set of facts consistent with the complaint that would entitle the plaintiff to relief.  *See McMillan v. Collection Prof'ls Inc.,* 455 F.3d 754, 759 (7th Cir. 2006)*; Centers v. Centennial Mortgage, Inc.*, 398 F.3d 930, 933 (7th Cir. 2005); *Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003), *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001).[6]

In May of this year, however, the Supreme Court sent this characterization of Rule 12(b)(6), which sprang from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), to the trash bin.  *Bell Atl. Corp. v. Twombly*, 550 U.S. ---, ---, 127 S.Ct. 1955, 1969 (2007). "*Conley*'s 'no set of facts' language . . . is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Id.*

In *Bell Atlantic*, the Court dismissed a putative class action antitrust lawsuit because the Plaintiffs' complaint failed to plead sufficient facts to suggest an agreement or conspiracy in restraint of trade.  *Id.* at 1973.  The plaintiffs accused the defendants of forming agreements to refrain from competing with one another.  *Id.* at 1962.  They alleged the existence of a conspiracy.  *Id.*  However, the court termed these to be

---

[6]  The Supreme Court itself used very similar language recently.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of of facts that could be proved consistent with the allegations.' *Hishon v. King & Spalding*, 467 U.S. 69, 73 [parallel citations omitted] (1984)").

"ultimate allegations," *id.*, that do not necessarily satisfy Rule 8's requirement of giving the defendant fair notice of the plaintiff's claims "'and the grounds upon which it rests,'" *id.* at 1964-65 (quoting *Conley*, 355 U.S. at 47).

In *Bell Atlantic*, the existence of a conspiracy or an agreement was the heart of the plaintiffs' anti-trust claim. "Asking for plausible grounds to infer an agreement . . . simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl.*, 127 S.Ct. at 1965. The Court stressed it was not imposing "heightened fact pleading of specifics." *Id.* at 1974. Well pleaded complaints may survive a Rule 12(b)(6) motion to dismiss even if the trial judge disbelieves the factual allegations or considers recovery to be extremely unlikely. *Id.* at 1965 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). However, plaintiffs must provide enough facts that "nudge[ ] their claims across the line from conceivable to plausible." *Id.* at 1974.

*Bell Atlantic*'s mandate, that a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face," *id.*, no doubt appears at odds with the Seventh Circuit's instruction that a plaintiff need not plead particular facts. *See Vincent v. City Colleges of Chi.*, 485 F.3d 919, 923 (7th Cir. 2007) (stating that "a judicial order dismissing a complaint because the plaintiff did not plead facts has a short half-life. . . . [t]he possibility that facts to be adduced later, and consistent with the complaint, could prove the claim, is enough for the litigation to move forward"). However, even prior to *Bell Atlantic*, the Seventh Circuit has required plaintiffs to provide the grounds of their

6

entitlement to relief.  *See, e.g.*, *Doherty v. City of Chicago*, 75 F.3d 318, 326 (7th Cir. 1996) (stating "there must be sufficient facts pleaded to allow the court and the defendants to understand the gravamen of the plaintiff's complaint"); *Carl Sandburg Village Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 207 (7th Cir. 1985) (insisting on "direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory"); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) (requiring a "reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint").[7]

Thus, while it remains true that a plaintiff need not provide specific facts, a plaintiff must provide "more than labels and conclusions."[8]  *Bell Atl.*, 127 S.Ct. at 1964-65.  "Factual allegations must be enough to raise a right to relief above a speculative level."  *Id.* at 1965.  As one circuit has observed, *Bell Atlantic* "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."  *Iqbal v. Hasty*, 2007 WL 1717803, at *11 (2d Cir.  June 14, 2007) (emphasis in original).  In this regard, the Court added muscle to *Doherty*'s familiar rule that a complaint must provide sufficient facts to comprehend the gravamen of the claim.

----

[7]  Even *Carl Sandburg* would not require a plaintiff, aside from claims governed by Rule 9, to plead particular facts supporting *every* element of a legal theory, just sufficient facts to make an inferential allegation possible, or in the language of *Bell Atlantic*, to make the claim plausible.

[8]  Although many of the Court's statements appear tailored to antitrust claims, the comments in this paragraph all pertain to the Court's observations about the "general standards" of pleading required by Federal Rule of Civil Procedure 8(a)(2).

## II.  DISCUSSION

There are two main issues before the court.  The first is whether Indiana's whistle blower statute, Ind. Code § 22-5-3-3, protects the sort of activities that allegedly led to Mr. Ryan's firing.[9]  The second is whether Indiana's public policy exception to the doctrine of at-will employee applies to the sort of rights and duties he was allegedly exercising prior to his dismissal.[10]

### A.  Whistle Blower Statute

In cases involving private employers under public contract,  Indiana's private employer whistle blower statute, Indiana Code § 22-5-3-3, protects the employee from discharge or other disciplinary action for having reported "in writing" a violation of federal, state, or local law or regulation, or a misuse of public resources.  *Id.*

The first part of the statute reads:

An employee of a private employer that is under public contract may report in writing the existence of: (1) [a] violation of a federal law or regulation; (2) [a] violation of a state law or rule; (3) [a] violation of an ordinance of a political subdivision . . .  or (4) [t]he misuse of public resources; concerning the execution of public contract *first to the private employer, unless the private employer is the*

_____

[9]  UL initially asked the court to address possible violations of Mr. Ryan's First Amendment rights under 42 U.S.C. § 1983.  (*See* Def.'s (First) Mem. Supp. 5-8.)  Mr. Ryan made no such claim, either in his initial Complaint or the Amended Complaint, and UL has not renewed its argument in its brief supporting its pending motion to dismiss, so the court will not address this issue.

[10]  The Amended Complaint does not state directly that he was an at-will employee but, in seeking a wrongful discharge under the public policy exception, must be read in this light. (*See* Am. Compl. ¶¶ 43-49.)

> *person whom the employee believes is committing the violation or misuse of*
> *public resources. In that case,* the employee may report the violation or misuse of
> public resources in writing to either the private employer or to any official or
> agency entitled to receive a report from the state ethics commission. . . . If a
> good faith effort is not made to correct the problem within a reasonable time, the
> employee may submit a written report of the incident to any person, agency, or
> organization.

*Id.* § 22-5-3-3(a) (emphasis added).

Thus, to bring a cause of action under the private employer whistle blower statute, the plaintiff must be an employee of a private employer that is under contract, and the plaintiff must report violations or misuse of resources "concerning the execution of public contract." *Id.* Mr Ryan asserts that the statute "clearly provides" that the report may be about violations or misuse of resources "by any entity, not just the employer." (Pl.'s Resp. Opp'n Mot. Dismiss Am. Compl. [hereinafter Pl.'s Am. Resp.] 21.) However, aside from highlighting the italicized words in the passage above, he does not provide any legal argument or citations as to why this would be so.

The statute as written, lacking any article or modifier before the word "execution," is somewhat ambiguous. Inserting "any" before "execution" would provide the meaning that Mr. Ryan prefers; inserting "this" before "execution" would make it plain that the violations or misuse of resources must concern the private employer's public contract, not just any contract. *See* Ind. Code § 22-5-3-3(a).

The latter meaning is a more reasonable interpretation of the General Assembly's intent. Under a longstanding rule of Indiana statutory construction, when terms are used in one place in a statute, "'they will be construed as used in that same

sense at other places in the statute, unless the clear context of the statute requires a different meaning.'"  *600 Land, Inc. v. Metro. Bd. of Zoning Appeals*, 863 N.E.2d 339, 347 (Ind. Ct. App. 2007) (quoting *Jones v. State*, 569 N.E.2d 975, 979 (Ind. Ct. App. 1991)); *accord Ryan v. State*, 92 N.E. 340, 342 (Ind. 1910).  Here, the first mention of a "contract" is to the private employer's public contract, and absent any language indicating otherwise, all subsequent uses of the word "contract" refer to the private employer's public contract.

The highlighted words do not suggest otherwise.  Presumably Mr. Ryan would like the court to infer that, by referring to times when the employer is not the person believed to be the violator or misuser of public funds, the statute is referring to contracts not involving the employer.  However, there is no compelling reason to read the words this way.  First, contracts often involve multiple parties, including contractors and subcontractors.  Second, the term "employer" would ordinarily refer to the entity individually, not necessarily its employees.

The most reasonable interpretation is that the General Assembly wanted employees to report wrongdoing first to their employer to give the employer a chance to correct the problem unless management themselves – those who could fairly be said to represent the employer entity – were involved.  This interpretation is supported by the later sentence authorizing the employee to submit a written report of the problems to any person, agency, or organization if no corrective action is taken within a reasonable time.

For these reasons, the court finds that the private employer statute only applies to reports about wrongdoing involving the employer's public contract and turns to an examination of the Amended Complaint.

At the time of his discharge Mr. Ryan, a chemist, was a laboratory manager at UL's South Bend drinking water testing facility, formerly known as Environmental Health Laboratories, Inc., and since renamed as UL's Drinking Water Laboratory.  (Am. Compl. ¶¶ 4, 5, 15.)  Nothing in the Amended Complaint suggests that Mr. Ryan had any connection to any public contract that UL may have had in connection with NIST or the collapse of the World Trade Center buildings.  Nor does Mr. Ryan provide any basis for inferring that he possessed any particular knowledge about how UL executed its contracts.  Rather, he says he arrived at his concerns following a "period of study and reflection" shortly after the terrorist attacks.  (*Id.* ¶ 18.)  Thus the Amended Complaint strongly suggests that Mr. Ryan possessed no more knowledge about UL's public contracts than any like-minded citizen of similar background and training, and that in writing to UL and NIST, he was attempting only to making them aware of his theories and conclusions, not of particular problems with any UL conduct.

Mr. Ryan complied with the procedural requirements of the statute.  He first reported his concerns to UL's chief executive officer and other officials on November 19, 2003, and December 2, 2003.  (Am. Compl. ¶18).  These officials responded in writing, stating their belief in the generally well-known explanations for the buildings collapses.  (*Id.* ¶ 19.)  They took no other action, and on November 11, 2004, Mr. Ryan wrote a

letter to NIST stating his concerns regarding the explanation and investigation of the collapses.  (*Id.* ¶¶ 20-21.)

The key issue is whether, considering all of the facts alleged in the Amended Complaint, the court can infer that is not merely conceivable but plausible that his letters contained the sort of information that would qualify them as protected reports under the statute.  That is, did the written reports allege a violation of federal, state, or local laws or regulations, or a misuse of public resources, regarding UL's execution of its contract with NIST?

In a claim under Indiana's private employer whistle blower statute the existence of a violation or misuse of public resources is nearly as much at the center of a wrongful discharge claim as the existence of a conspiracy charge is to an antitrust claim under § 1 of the Sherman Act.  *See Bell Atlantic*, 127 S.Ct. at 1964.  The only major difference is that a whistle blower claim is a derivative claim.  A plaintiff must also allege the filing of a written report about the claimed violation or misuse of public resources.

The whistle blower statute is not aimed at protecting plaintiffs who believe that their employer's conduct needs to be investigated because a thorough inquiry *might reveal* violations of law or regulation or misuse or public resources.  Rather it seeks to protect employees who report that, in their employer's execution of a public contract, a law or regulation *has been broken* or public resources misused.  At a minimum, a claim under the whistle blower statute must provide some grounds for inferring (1) that such

conduct occurred and (2) that this conduct was reported. *Bell Atlantic* requires this much.

Mr. Ryan's Amended Complaint falls short on both prongs. The closest it comes to alleging that UL was violating the law or misusing public resources is in the statement "Mr Ryan was fired because he made written whistleblowing reports in writing regarding apparent violations of law and misuses of public resources concerning the execution of public contracts by NIST contractors and NIST officials, and UL itself." (Am. Compl. ¶ 53.) However, this allegation does not directly assert that UL violated the law or misused public resources. On close reading, the use of the word "concerning" is ambiguous (and perhaps deliberately so). Mr. Ryan may be alleging that UL violated the law or misused public funds. Or he may simply be alleging that UL's testing should have revealed violations of law or a misuse of public resources by others.

This same sort of ambiguity resurfaces four paragraphs later when the Amended Complaint states "Mr. Ryan's letter to NIST was somewhat less explicit than his internal reports to UL but still explicit enough for UL, knowing what it did regarding his preceding internal disclosures to UL, to interpret as an allegation that a crime had been committed and public resources were being misused." (Am. Compl. ¶ 57.) This statement asserts that UL should have realized from Mr. Ryan's letter that he was reporting a crime or misuse of public resources, but a crime or misuse by whom?

In *Bell Atlantic*, the Supreme Court upheld the dismissal of a case when the complaint alleged a conspiracy among the defendants but failed to alleged sufficient

facts from which a conspiracy could be inferred.  *See Bell Atlantic*, 127 S.Ct. at 1962-63, 1974.  Here, under the most favorable reading, the Amended Complaint only offers conclusory labels about violations of law or misuse of public resources in connection with UL's contract with NIST, and even these labels are ambiguous.  The reader can only speculate.

Moreover, the majority of the Amended Complaint (and all of Mr. Ryan's initial Complaint) would lead most readers to conclude that Mr. Ryan was not complaining about UL's violations of laws or misuse of public resources but about the competency of the post-attack investigations and NIST's and (perhaps) UL's failure to uncover or consider evidence that other, as yet unknown conspirators were involved in the terrorist attacks.  He complained to UL and NIST that scientific analysis did not support the government's conclusion that the impact of the airplanes and resulting jet fuel fires caused the structural steel to fail.  (Am. Compl. § 18, 21.)  He notified UL as well that "substantial evidence" suggested a "well-engineered controlled implosion resulting from the use of explosive devices placed in the buildings.  (*Id.* ¶ 18(c).)  He observed that UL had certified the steel as capable of withstanding much higher temperatures than those resulting from the fires (*id.* ¶ 18(a)) and he urged the company "to act on this information at a minimum to protect its reputation . . . [and] to prevent future deaths" (*id.* ¶ 18(f)).

In short, the letters he sent to NIST and UL state his concerns about the adequacy of NIST's investigation and, by extension, UL's.  However, UL's competence is irrelevant to a whistle blower claim.

14

The Indiana Court of Appeals has concluded that a misuse of public resources under the private whistle blower statute "contemplates a direct expenditure or use of public funds, property, or resources for a purpose other than that contemplated by the contract in question." *Coutee v. Lafayette Neighborhood Housing Servs., Inc.*, 792 N.E.2d 907, 914 (Ind. Ct. App. 2003).  In this respect, misuse would include the spending of funds for personal use or for any purpose not allowable under the contract, "whether legitimate or not." *Id.*  However, it would not include the waste of money through mismanagement or incompetence.

So even if UL's failure to investigate Mr. Ryan's concerns about terrorist attacks or arrive at his conclusions could be termed a waste of money, as Mr. Ryan so evidently believes it was, its conduct was not the sort of wrongdoing, the report of which the private employer whistle blower statute is aimed to protect.  In short, Mr. Ryan has not alleged a statutory claim.

The Amended Complaint provides no reasonable basis for inferring that UL broke any laws or federal regulations, or spent public resources on an unallowed purpose. Nor does it provide any basis for inferring that Mr. Ryan reported such conduct to UL or NIST.  Even under the most favorable reading of the Amended Complaint, in which the court accepts all of his factual allegations as true and draws all reasonable inferences in his favor, Mr. Ryan's right to relief under Indiana's private employer whistle blower statute is speculative at best.

The court therefore **GRANTS** UL's motion to dismiss this claim.  Given the possibility, however remote, that Mr. Ryan can allege facts showing, or at least from which it can be inferred, that UL violated laws or regulations, or misused public resources, in its execution of a public contract, and that he reported such facts to UL and NIST, the dismissal will be **WITHOUT PREJUDICE** subject to the filing of an amended complaint within fifteen days.  However, in considering whether to seek leave to amend the Amended Complaint, Mr. Ryan and his counsel should be mindful that, under Federal Rule of Civil Procedure 11, assertions of wrongdoing by UL that are made without any evidentiary support[11] could be a basis for monetary sanctions against Mr. Ryan, his counsel, or both.

### B.  Public Policy Exception

Indiana traditionally has acknowledged two forms of employment: at will and employment for a definite or ascertainable term.  *Orr v. Westminster Village N., Inc.*, 689 N.E.2d 712, 717 (Ind. 1997).  An employee who serves at will can generally be fired "at any time for a 'good reason, bad reason, or no reason at all.'"  *Montgomery v. Bd. of Trs. of Purdue Univ.,* 849 N.E.2d 1120, 1128 (Ind. 2006) (quoting *Sample v. Kinser Ins. Agency*, 700 N.E.2d 802, 805 (Ind. Ct. App. 1998)).  Nonetheless, the Indiana Supreme Court has recognized a "public policy exception" to the employment at will doctrine.[12]

---

[11]  Or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

[12]  The other two exceptions are consideration, which rebuts the presumption of at-will employment, and promissory estoppel, which enforces an employer's promise under

(continued...)

An at-will employee can bring a wrongful discharge lawsuit against his employer if he or she is fired in contravention of a "clear statutory expression of a right or duty." *Westminster Village*, 689 N.E.2d at 718.

This exception, however, is not so broad as it first sounds (or as Mr. Ryan would have it). The Indiana Supreme Court has allowed a wrongful discharge lawsuit when an employee has been fired for filing a workmen's compensation claim, *Frampton v. Cent. Ind. Gas Co.*, 297 N.E.2d 425, 428 (Ind. 1973), and when an employee refused to commit an illegal act for which he could be charged, *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390, 393 (Ind. 1988). Yet the court has expressly stated its unwillingness to create a "generalized public policy exception." *McClanahan*, 517 N.E.2d at 393; *accord Wior v. Anchor Indus., Inc.*, 669 N.E.2d 172, 177 n.5 (Ind. 1996).

In *Cantrell v. Morris*, 849 N.E.2d 488, 498 (Ind. 2006), the Indiana Supreme Court declared that a state constitutional provision can, just as much as a statute, supply the duty that is an element of a wrongful discharge claim. However, in making this comment, the court was not announcing a public policy exception to at-will employment based on retaliatory discharge for an employee's exercise of a constitutional right. Rather, in *Cantrell*, the court was merely stating a general principal that constitutional provisions are, like statutes, legislative provisions. *Id.* at 497. The

---

[12](...continued)
circumstances meeting the requirements of Restatement (Second) of Contracts § 90.

court did not expand the public policy exception beyond the confines set by *Frampton* and *McClanahan*.[13]

Only earlier this year, the Indiana Supreme Court reaffirmed the narrowness of the public policy exception. *Meyers v. Meyers*, 861 N.E.2d 704, 706 (Ind. 2007). The court noted that the *Frampton* exception was based on express statutory language prohibiting employers from evading the obligations of the Indiana Worker's Compensation Act. *Id.* The Act provided that "no rule, regulation, or other device" shall relieve an employer from its obligations, and the Frampton court had found the threat of discharge to be such a device. *Id.* (quoting *Frampton*, 297 N.E.2d at 427-28). The *McClanahan* exception was based on the recognition that the absence of a remedy would encourage criminal conduct. *Id.*

Following the Indiana Supreme Court's lead, the Indiana Court of Appeals has generally allowed the public policy exception only in cases involving worker's compensation claims or in cases in which a plaintiff was "allegedly terminated in retaliation for refusing to violate a legal obligation that carried penal consequences." *Id.* at 707 (citing *McGarrity v. Berlin Metals*, 774 N.E.2d 71, 78-79 (Ind. Ct. App. 2002)

---

[13] In *Cantrell*, a decision involving issues that had been certified, the court declined to decide if a public employee could bring a wrongful discharge lawsuit alleging a violation of the employee's freedom of speech in violation of Article I, Section 9 of the Indiana Constitution. It merely ruled that such an action, if possible, would be a common law claim governed by the Indiana Tort Claims Act. *Id.* at 507. *Cantrell* also emphasis the narrowness of the public policy exception and circumscribed prior statements that might seem to imply a broader exception. *Compare Westminister*, 689 N.E.2d at 718 (stating "we have recognized a public policy exception to the employment-at-will doctrine if a clear statutory expression of a right or duty is contravened") *with Cantrell*, 849 N.E.2d at 494 (declining to embrace the general principle that a wrongful discharge lawsuit may be brought whenever an employee has been fired "for exercising a statutory right or for refusing to violate the law").

(refusal to file fraudulent tax return); *Haas Carriage, Inc. v. Berna*, 651 N.E.2d 284, 288 (Ind. Ct. App. 1995) (refusing to haul unlawful road)*; Call v. Scott Brass, Inc.*, 553 N.E.2d 1225, 1230 (Ind. Ct. App. 1990) (refusing to disregard jury summons)).

Likewise, in keeping with this narrow view of the public policy exception, Indiana appellate courts have not allowed wrongful discharge lawsuits based on alleged retaliation for filing an unemployment claim, *Lawson v Haven Hubbard Homes, Inc.*, 551 N.E.2d 855, 860 (Ind. Ct App. 1990), for refusing to submit to a polygraph examination, *Hamblen v. Danners, Inc.*, 478 N.E.2d 926, 929 (Ind. Ct. App. 1985), for internally reporting misconduct affecting the validity of a drug company's federal drug safety reports, *Campbell v. Eli Lilly & Co.*, 413 N.E.2d 1054, 1061-62 (Ind. Ct. App. 1980), and for reporting to a company official a supervisor's alleged illegal kickbacks, *Martin v. Platt*, 386 N.E.2d 1026, 1028 (Ind. Ct. App. 1979).  (Aside from *Lawson*, these cases were decided prior to *McClanahan*.  However, in *Meyers*, the Indiana Supreme Court cited all four as examples of the decisions establishing that the public policy exception is "quite a limited exception."  *Meyers*, 861 N.E.2d at 707.)

To invoke the public policy exception to at-will employment then, under existing Indiana law, a plaintiff must show that he or she was fired either for (1) exercising a specific right and a statute (or constitutional provision) clearly restricts the employer's ability to terminate the employee for exercising this right or (2) fulfilling a specific duty for which the law imposes criminal penalties upon those who fail to do so.

Thus in *Meyers*, 861 N.E.2d at 705, the Indiana Supreme Court affirmed that an employee's general right to be paid for his work would not trigger the public policy exception, and in *Montgomery*, 849 N.E.2d at 1130-31, it held that neither would an alleged violation of Indiana's Age Discrimination Act.  As the court explained, "[g]eneral expressions of public policy do not support new exceptions to the employment-at-will doctrine."  *Id.* at 1128.

Mr. Ryan has cited in his Amended Complaint seven possible sources for a public policy exception.  (Am. Compl. ¶¶ 43-49.)  All stem from a citizen's rights under the U.S. and Indiana Constitutions to engage in free speech and to petition the government, or a citizen's general rights and duties under federal and state law to report safety hazards and wrongdoing.  In his brief, these seven duties become fourteen, but the substance remains generally the same: Mr. Ryan had a right to speak out and a duty to report safety hazards, material facts in a government investigation, and potential felonies and terrorist threats.  (Pl.'s Am. Resp. 15-30.)

All of these rights and duties, however, are general rights and duties.  They are are not specific to employment, as in *Frampton.*  They do not impose, as the Indiana Worker's Compensation Act does, a specific requirement on employers to refrain from firing or threatening to fire an employee for the exercise of these rights.[14]  Neither the First Amendment, which limits government action, nor Section 1, Article 9 of the Indiana

---

[14]  Mr. Ryan has dropped his claim of a public policy exemption arising under the Occupational Safety and Health Act, and therefore this statute will not be examined further. (See Pl.'s Am. Resp. 23.)

Constitution restricts a private employer's ability to terminate an employee for exercising

their right of free speech or right to petition the government.  *Yatvin v. Madison Metro.*

*Sch. Dist.*, 840 F.2d 412, 420 (7th Cir. 1988) (noting that "[t]he First Amendment

retaliation concept applies only to public employment, since private employers are not

subject to the amendment"); *Cantrell*, 849 N.E.2d at 492 (declaring that Section 9 only

restrains government actors and "[a] termination by a private employer, therefore, can

have no Section 9 implications").[15]

In his response to UL's first motion to dismiss, Mr. Ryan states that his claim to a

public policy exception arising from his right and duty to report occupational safety

hazards was not based on rights and duties arising from statutory workplace safety

laws.  (Pl.'s First Resp. 23.)  Laws such as the Occupational Safety and Health Act

generally provide their own remedial schemes.  See 29 U.S.C. § 660(c)(2).  Such

schemes make a public policy exception in such circumstances unnecessary.  *See*

*Groce v. Eli Lilly & Co.*, 193 F.3d 496, 504 (7th Cir. 1999) (holding that employee did not

state a cognizable claim under the public policy exception when he did not pursue a

statutory remedy for discharge in retaliation for reporting violations of the Indiana

Occupational Safety and Health Act).  Mr. Ryan asserts rather that these claims also

arise from his rights and duties under the First Amendment and the Indiana

---

[15] Section Nine of Article One of the Indiana Constitution reads: "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible."

Constitution.  (Pl.'s First Resp. 23.)  As stated above, these are general rights and duties that do not restrict a private employer's right to fire an employee.

Nor would Mr. Ryan's failure to speak out or to report information to NIST expose him to criminal liability, as in *McClanahan*.  Mr. Ryan presents himself as a general manager of a drinking water laboratory, a facility that, presumably, seems highly unlikely to have had any responsibility or participation in tests, if any, that UL performed with regard to the World Trade Centers collapses.

Even supposing that Mr. Ryan had some inside knowledge regarding the quality of UL's tests or of some related misfeasance, he faced no criminal penalty for failing to report this information.  Mr. Ryan cites the misprision of felony statute and unnamed anti-terrorist statutes for establishing his duty to report potential felonies and terrorist activity.  However, as UL points out, the misprision statute, 18 U.S.C. § 4, would require Mr. Ryan to have actual knowledge of the commission of a felony – and take an affirmative step to conceal the felony from authorities.[16]  *United States v. Daddano*, 432 F.2d 1119, 1124 (7th Cir. 1970).  So even if Mr. Ryan had actual knowledge – rather than just theories – regarding as yet undiscovered felonies committed in the September 11, 2001, attacks, he would not face criminal liability by remaining silent.  For the same

---

[16] The statute reads:
Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.
18 U.S.C. § 4.

reason, he would not face criminal sanctions about any misconduct by UL in performing tests for NIST.

Lastly, Mr. Ryan argues that the private employer whistle blower statute, Indiana Code § 22-5-3-3, provide a statutory basis for invoking the public policy exception, even if his whistle blower claim fails.  (Pl.'s Am. Resp. 24.)  For the reasons discussed in the section directly addressing this statute, Mr. Ryan has not alleged any conduct implicating the whistle blower protection statute.  The whistle blower statute does not evidence a "clear public policy" to protect any complaining that might be characterized as whistle blowing – only that conduct meeting the statute's criteria.

Moreover, even if Mr. Ryan had provided a plausible claim to relief, his exercise of this right would not trigger a public policy exemption when the private employer whistle blower statute provides for legislative remedies.  Both in *Frampton* and in *McClanahan*, the Indiana Supreme Court allowed a public policy exception because the employee would otherwise be without a remedy.  *See Frampton*, 297 N.E.2d at 428; *McClanahan*, 517 N.E.2d at 393.  In Indiana, when a statute creates a right that did not previously exist under common law and prescribes the remedy for its infringement, the statutory remedy is presumed to be exclusive.  *Call*, 553 N.E.2d at 1227 (Ind. Ct. App. 1990).

Indiana Code § 22-5-3-3 was enacted by Public Law 31-1987, which took effect in 1988, well after the Indiana Supreme Court's 1973 decision in *Frampton*.  However, neither *Frampton* nor subsequent cases provided Indiana employees with any protective

23

rights against discharge or disciplinary action for whistle blowing.  Thus the statute created a right that did not previously exist, and it supplies the remedies: an employee's right to appeal the discharge or disciplinary action in a court of general jurisdiction and imposition of a Class A infraction upon employers found guilty of violating the statute. Ind. Code § 22-5-3-3.  Mr. Ryan can contest his discharge in a court of general jurisdiction, as he has done and as considered above.

Regardless of the substance of Mr. Ryan's allegations, he remained an at-will employee.  The rights that Mr. Ryan was exercising and the duties that he was fulfilling do not give rise to a public policy exception allowing a lawsuit for wrongful discharge. The court therefore **GRANTS** UL's motion to dismiss this claim.  This dismissal will be **WITH PREJUDICE** insofar as Mr. Ryan is seeking a wrongful discharge claim pursuant to Indiana's public policy exception to at-will employment with regard to the rights and duties identified in the Amended Complaint.

### III.  CONCLUSION

For the reasons discussed above, the court **DENIES** UL's Motion to Dismiss (Doc. No. 11) as moot and **DENIES** in part and **GRANTS** in part UL's Motion to Dismiss Mr. Ryan's Complaint (Doc. No. 24) with prejudice.

The court will **DISMISS** Mr. Ryan's claim for wrongful discharge pursuant to Indiana's private employer whistle blower statute.  This dismissal will be without

prejudice for **fifteen days** to allow Mr. Ryan to seek leave to amend his Amended

Complaint, if he so desires after considering the court's discussion above.

The court will **DISMISS WITH PREJUDICE** Mr. Ryan's claim of wrongful

discharge pursuant to Indiana's public policy exception and for exercising the rights or

fulfilling the duties listed in the Amended Complaint.

These dismissals will be entered by separate order.

ALL OF WHICH IS ENTERED this 8th day of August 2007.


_____
John Daniel Tinder, Judge
United States District Court


Copies to:

Magistrate Judge Tim A. Baker

Mick G. Harrison
The Caldwell Center
mickharrisonesq@earthlink.net

Rudolph William Savich
rsavich@aol.com

Kara L. Reagan
STAFFORD LAW OFFICE, LLC
kara@cstaffordlaw.com

Aviva Grumet-Morris
WINSTON & STRAWN LLP
agmorris@winston.com

Michael P. Roche
WINSTON STRAWN LLP
mroche@winston.com

Thomas E. Deer
LOCKE REYNOLDS LLP
tdeer@locke.com